## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil No. 06-1213 (JRT/FLN) |
| Plaintiff, | |
| v. | **ORDER ADOPTING REPORT AND RECOMMENDATION** |
| SHERWIN P. BROWN, JAMERICA FINANCIAL, INC., and BRAWTA VENTURES, LLC | |
| Defendants. | |

Robert M. Moye, John J. Kaleba, Charles K. Kerstetter, and Erik J. Lillya, **UNITED STATES SECURITIES & EXCHANGE COMMISSION**, 175 West Jackson Boulevard, Suite 900, Chicago, IL 60604-2615, for plaintiff.

Julie H. Firestone and Matthew D. Forsgren, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 5402, for defendants.

This case is now before the Court on the objections of Sherwin P. Brown and Jamerica Financial, Inc. (collectively, "defendants") to a Report and Recommendation issued by United States Magistrate Judge Franklin L. Noel on June 12, 2008. After a *de novo* review of those objections, *see* 28 U.S.C. § 636(b); Local Rule 72.2(b), the Court adopts the Report and Recommendation of the Magistrate Judge.

## BACKGROUND

Defendant Jamerica Financial, Inc. ("Jamerica") is registered with the Securities and Exchange Commission ("SEC") as an investment adviser. (Answer at ¶8.) Jamerica provides investment advisory services and portfolio management services to more than

250 clients across several states.  (*Id.* ¶5.)  Defendant Sherwin P. Brown ("Brown"), a resident of St. Paul, Minnesota, is the President and 50% owner of Jamerica.  (*Id.* ¶6.) Brown controls Jamerica and provides investment advisory services to its clients.  (*Id.*) Jamerica charges a fee to its clients based on the size of a client's investment, but that fee rate is capped at 1.5%.  (*Id.* ¶10.)

In or about May 2004, Brown organized Brawta Ventures, LLC ("Brawta"), a purported private investment firm.  (*Id.* ¶11.)  Brown was Brawta's general managing partner.  (*Id.* ¶7.)  Brown marketed shares directly to clients of Jamerica, and initially charged $10,000 per share.  (*See* Swanson Decl. at ¶¶2-5; Pickhartz Decl. at ¶¶1-4; Smith Decl. at ¶¶1-5.)  However, Brown did not provide these investors with any written disclosures before they invested in Brawta.  (*See* Swanson Decl. at ¶3; Pickhartz Decl. at ¶3; Smith Decl. at ¶3.)  Brown told some investors that Brawta would operate like a mutual fund and invest in publicly traded stocks, (*see* Pickhartz Decl. at ¶3), and told others that it would operate as a venture capital fund and invest in start-up companies. (*See* Smith Decl. at ¶3.)  Brawta investors also recall hearing inconsistent explanations for how Brown would be compensated.  In one case, Brown indicated that he would not charge a separate fee for managing Brawta, but rather would receive compensation from the fees that the investors were paying to Jamerica.  (Smith Decl. at ¶4.)  In another case, Brown indicated that he would receive a percentage of any Brawta profits that exceeded $1 million, but would not receive money from Brawta otherwise.  (Swanson Decl. at ¶4.) In a third case, investors believed that Brown would simply receive a percentage of the assets under Brawta's management.  (Reinert Dep. at 103.)  No investors, however, recall

being informed before the initiation of this lawsuit that any funds from their Brawta accounts had been withdrawn to pay fees or management expenses.  (*See* Swanson Decl. at ¶¶2-5; Pickhartz Decl. at ¶¶1-4; Smith Decl. at ¶¶1-5.)

Between May 2004 and January 2006, approximately fifty-three investors invested a total of approximately $1.62 million in Brawta.  (Compl. at ¶¶7, 12.)  The SEC alleges that Brown was solely responsible for selecting Brawta's investments, (*Id*. ¶7), and declarations from former Brawta clients indicate that Brown stated this in his marketing pitch.  (*See* Swanson Decl. at ¶3; Pickhartz Decl. at ¶3; Smith Decl. at ¶3.)  In addition, Brown had sole signature authority over the Brawta bank account.  (*See* Javorski Decl. at ¶8.)

An accountant employed by the SEC has prepared summaries of Brawta's financial activities.  (*See* Javorski Decl., Docket No. 4)  The accountant indicates that between May 24, 2004, and August 17, 2004, $240,406 was withdrawn from the Brawta account and deposited into Brown's personal checking account.  (*Id*. ¶10.)  Later, between November 29, 2004, and January 3, 2006, $265,500 was withdrawn from the Brawta account and deposited into a Jamerica account.  (*Id*. ¶11.)  This transfer was accomplished by writing a check from the Brawta account to purchase an official US Bank check, which was then deposited into the Jamerica account.  (*Id*.)  Between November 10, 2004, and February 13, 2006, an additional $216,050 was withdrawn from the Brawta account and deposited into the Jamerica account.  (*Id*. ¶12.)  This transfer was accomplished with a check written on the Brawta account to Wells Fargo Bank and by customer counter withdrawals, followed by deposits into the Jamerica account.  (*Id*.)  On

June 30, 2005, an additional $15,000 was withdrawn from the Brawta account and deposited into Jamerica's account. (*Id.* ¶13.) This transfer was accomplished with a check written on the Brawta account to purchase an official US Bank check, which was then deposited into Jamerica's account. (*Id.*) In addition, between June 17, 2004, and February 13, 2006, an additional $110,177 was withdrawn from the Brawta account, by checks payable to US Bank. (*Id.* ¶14.) While the SEC accountant was unable to pinpoint the manner in which these funds were expended, he notes that these transactions were similar to those discussed above, in that checks were written to banks rather than payees. (*Id.*)

The SEC's accountant indicates that all of these transfers typically came at times when either Brown or Jamerica were running low on funds. (*Id.* ¶¶19-20.) The SEC also indicates that following the transfers to Jamerica, thousands of dollars in payments from Jamerica's account were made to the Apple Store, a lawn care service; Polo/Ralph Lauren; Coach; Circuit City; Helzberg Diamonds; Netflix; and Victoria's Secret. (*Id.* ¶42.)

Finally, on July 11, 2005, a Brawta check in the amount of $22,500 was written to Timothy Gullickson. (*Id.* ¶15.) Gullickson indicated that this check was intended as payment for a personal loan to Brown from 2002. (*Id.*, Gullickson Dep. at 13-29.) On March 2, 2006, after the SEC had begun investigating Brown, Brown called Gullickson to discuss this check. (Gullickson Dep. at 28.) Brown "hinted" that if Gullickson was asked about the check, he should indicate that it was payment for "investment advice" or for "help[ing] him in choosing stocks for his mutual fund." (*Id.*) Gullickson "thought

[Brown] was asking [him] to tell a lie," and reported the conversation to his employer. (*Id*. at 29-31.)   Gullickson's employer then reported the incident to the National Association of Securities Dealers ("NASD").   (Docket No. 207 Attach. 22.)   In sum, the SEC's accountant concludes that approximately $869,633 was transferred out of the Brawta checking account for non-investment purposes.   (Javorski Decl., Docket No. 4 at ¶16.)

On February 27, 2006, the SEC began an investigation of Jamerica.   (Karlin Decl. at ¶3.)   During that investigation, the SEC requested documents detailing Brawta's activities.   (*Id*. ¶¶8-9, 17.)   Brown was unable to produce complete bank records for the Brawta account, a list of Brawta's investments, or any documentation describing how Brawta's asset value was determined.   (*Id*. ¶¶9, 17.)   Brown's counsel also conceded that no written disclosures concerning Brawta had been given to its investors.   (*Id*. ¶8.) Finally, Brown stated that no fees for the management of Brawta had been taken from Brawta's funds, and that all fees for managing Brawta were collected as part of the fee charged by Jamerica.   (*Id*. ¶6.)   In addition, the most recent books and records that the defendants produced for Jamerica were only current through December 31, 2004.   (*Id*. ¶5.)   The general ledgers for Jamerica contained funds diverted from Brawta that were falsely characterized on the ledger as capital contributions from Brown.   (*See* Javorski Decl., Docket No. 5 ¶¶51-52.)   Finally, defendants have not disputed that Jamerica's account statements overstated the value of Brawta's shares while their value dropped to approximately 50% of the original purchase price by December 2005.   (*See* Javorski Decl., Docket No. 108 ¶15.)

On March 29, 2006, the SEC filed this action in federal district court, alleging violations of sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act"), *see* 15 U.S.C. § 77q(a)(1)-(3); section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), *see* 15 U.S.C. § 78j(b); Rule 10b-5 promulgated under the Exchange Act, *see* 17 C.F.R. § 240.10b-5; sections 206(1)-(2) of the Advisers Act, *see* 15 U.S.C. § 80b-4, 80b-6(1)-(2); and Rule 204-2 of the Advisers Act, *see* 15 U.S.C. § 80b-4.   The SEC also alleges that Brown aided and abetted Jamerica's violations of the Advisers Act.

On the date that this action was filed, the defendants were ordered to submit an accounting of Brawta's financial activities.   (*See* Docket No. 10.)   According to that accounting, $865,389.76 of Brawta's funds had been invested.  (Siiro Decl. at ¶9.)   The accounting added, however, that Brawta had made "unallocated payments" totaling $877,236.16.  (*Id.*)  Those payments included $145,400 transferred to a checking account in Brown's name, (*see id.*; Javorski Decl., Docket No. 5 at ¶16), a total of $521,483 to Jamerica accounts (*see* Siiro Decl. at ¶9; Javorski Decl., Docket No. 5 at ¶¶17-18), and a total of $210,353.16 transferred to destinations that could not be identified.  (Siiro Decl. at ¶9)

On April 30, 2007, Brown's counsel was advised by the United States Attorney's Office that Brown was the target of a federal grand jury investigation.   On the following day, Brown brought a motion for a stay of these proceedings and sought a protective order preventing depositions of the defendants.  (*See* Docket No. 117.)  On July 16, 2007, United States Magistrate Judge Janie S. Mayeron denied that motion, (*see* Docket No. 167), and this Court later affirmed that order.  (*See* Docket No. 216.)  On July 25, 2007,

Brown appeared for his deposition and asserted his Fifth Amendment privilege. (*See* Brown Dep., Ex. 21.)  Brown also refused to testify on behalf of Jamerica or Brawta and refused to produce another witness who could testify on behalf of those entities instead. (*Id.* 151.)

The SEC subsequently moved for summary judgment against Brown and Jamerica.[1]  Following a hearing, the Magistrate Judge recommended granting the SEC's motion as to each of its claims.  The Magistrate Judge also recommended issuing a permanent injunction preventing future violations of these provisions and disgorging $869,633 from the defendants with prejudgment interest.  Brown and Jamerica now object to those recommendations.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all

---

[1] Brawta is now controlled by a receiver, and the SEC indicates that it anticipates seeking the receiver's consent to an entry of judgment against Brawta in the near future.  (Pl.'s Mem. in Supp. Summ. J. at 1 n.1.)

reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).

## II.   DEFENDANTS' REQUEST FOR A STAY

The Court first notes that the defendants have renewed their request for a stay of this litigation.  As noted above, defendants previously asked this Court to stay these proceedings pending the completion of the Department of Justice's criminal investigation.  (*See* Docket No. 117.)  The defendants argued that it was unfair to force Brown to face the choice of either (1) invoking his Fifth Amendment rights and risking adverse consequences in his civil action, or (2) engaging in discovery in the civil case and risking conviction.  However, because no criminal indictment has been issued in this case – and may never be issued – the defendants' motion was denied.  (*See* Docket Nos. 167, 216.); *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995) ("A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege."); *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) (noting that a stay of a civil case is an "extraordinary remedy," and that "stays will generally not be granted before an indictment is issued").

This issue has turned out to be critical in this case, because Brown elected to exercise his Fifth Amendment rights, and has brought forth almost no evidence in his

defense.   Nonetheless, the Court finds no basis for revisiting this issue here.   The issue was fully briefed to United States Magistrate Judge Janie S. Mayeron, and was the subject of a hearing.   (*See* Docket No. 155.)   Magistrate Judge Mayeron then issued a thorough written memorandum supporting her ruling.     (*See* Docket No. 167.)   Subsequently, this issue was the subject of another round of briefing after defendants filed objections to the Magistrate Judge's order.   This second round of briefing was followed by another written order issued by this Court.   (*See* Docket No. 216.)   In short, the defendants have had a full and fair opportunity to be heard on this issue.   Defendants do not indicate that Brown has been indicted, or that there has been any other change in Brown's circumstances that would impact the reasoning of either this Court or Magistrate Judge Mayeron.    Moreover, granting a request for a stay where there has been no indictment risks putting a case on hold indefinitely, a result which is particularly problematic in a case where hundreds of investors were allegedly deprived of considerable sums of money.   In those circumstances, the Court declines to amend its prior conclusion.   The Court next turns to the impact of Brown's invocation of the Fifth Amendment.

## III.  IMPLICATIONS ON THE EVIDENTIARY RECORD OF BROWN'S INVOCATION OF THE FIFTH AMENDMENT

Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure to bring forward evidence in their defense.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).   The Court may not punish a party for invoking the Fifth

Amendment, *see SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1208 (D. Utah 2007), and a direct inference of guilt or liability from a party's silence is forbidden. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). However, a district court has discretion to fashion a response to a party's invocation of the Fifth that is no more harsh than necessary to prevent unfair and unnecessary prejudice to the other side. *See Colello*, 139 F.3d at 677; *Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d at 1209. Courts elsewhere have shifted the burden to the defendant to demonstrate an entitlement to disputed funds, *id.*; stricken a counterclaim and an affirmative defense in their entirety, *see United States v. One Parcel of Real Prop.*, 780 F. Supp. 715, 722 (D. Or. 1991); and prevented a defendant from offering evidence in support of positions on which he had invoked the Fifth Amendment. *See SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987).

Here, the only evidence brought forward by Brown in response to the SEC's motion is a set of interrogatory responses supplied in April 2007. (*See* Forsgren Aff. Ex. 1.) The Magistrate Judge noted that Brown submitted these responses and then invoked the Fifth Amendment, thereby preventing the SEC from exploring his answers in a deposition. (*Id.*) The Magistrate Judge concluded that it would therefore be "fundamentally unfair" to allow Brown to rely on these responses in opposing summary judgment. (Report and Recommendation at 7.) The defendants broadly assert that this conclusion was "erroneous[]," but cite to no authorities in support of this challenge, and do not offer any reasoning outside of renewing their argument on the stay issue. That issue has been resolved.

This Court agrees that it would be inappropriate to allow Brown to rely on his interrogatory responses in opposing summary judgment.  As the Magistrate Judge noted, Brown's invocation of the Fifth Amendment prevented the SEC from exploring and clarifying Brown's responses in a deposition.  The significance of that limitation is apparent in light of the content of those interrogatory responses.  In response to questions about the transfers of Brawta funds to Brown and Jamerica, Brown merely offered the broad explanation that the transfers were "related to compensation (i.e. management fees), expense reimbursements and consideration for assets transferred into the Brawta fund."  (Forsgren Aff. Ex. 1 at 4-5.)  This is precisely the sort of general answer on a critical issue that would have been explored in great detail in a deposition.  Allowing Brown to rely on it here would allow him to manipulate the discovery process so that his unquestioned, conclusory assertions are the only version of his testimony in the record.  *Cf. In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) (approving the striking of a self-serving affidavit where a party had invoked the Fifth Amendment to prevent a deposition); *United States v. Baker*, 721 F.2d 647, 650 (8th Cir. 1983) (disregarding direct testimony after a defendant invoked the Fifth Amendment to prevent cross-examination).  Thus, in order to prevent unfairness to the SEC, the Court will not consider Brown's interrogatory response in the context of this motion.

## IV.   VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE EXCHANGE ACT OF 1934

In counts I-III of its complaint, the SEC alleges violations of Section 17(a)(1), (a)(2), and (a)(3) of the Securities Act ("Section 17(a)"), Section 10(b) of the Exchange

Act ("Section 10(b)"), and Rule 10b-5.  Each of these statutes prohibits fraud in the sale

of securities.[2]  To establish a violation of Section 17(a)(1), Section 10(b), or Rule 10b-5,

---

[2] Specifically, Section 17(a) states:

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1)     to employ any device, scheme, or artifice to defraud, or
(2)     to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.  Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–

(b)     To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Under Section 10(b), the SEC has promulgated Rule 10b-5, which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)     To employ any device, scheme, artifice to defraud,
(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR §240.10b-5.

a plaintiff must prove scienter.  *See Aaron v. S.E.C.*, 446 U.S. 680, 701-02 (1980).[3]

Scienter in this context "means the intent to deceive, manipulate, or defraud," *In re

Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002), and can be proven with

evidence of "conduct which rises to the level of severe recklessness." *In re K-tel Int'l,

Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002).  Such conduct may include "highly

unreasonable omissions or misrepresentations involving an extreme departure from the

standards of ordinary care, and presenting a danger of misleading buyers or sellers which

is either known to the defendant or is so obvious that the defendant must have been aware

of it."  *Id*. (internal quotation marks omitted).

Here, the Magistrate Judge determined that the there is no genuine issue of

material fact as to whether the defendants violated each provision noted above and did so

with "severe recklessness."   Defendants now object to that conclusion, arguing that

Brown's intent is a question that should be left to a jury.   Defendants are correct that

questions concerning fraudulent intent are generally inappropriate for summary

judgment.  *See United States v. Philip Morris USA, Inc.*, 337 F. Supp. 2d 15, 24 (D.D.C.

2004).  Courts have indicated, however, that where there is overwhelming evidence of

severe recklessness and the defendants fail to bring forward countervailing evidence,

summary judgment for the plaintiff can be appropriate in securities fraud cases.  *See, e.g.,

SEC v. Lyttle*, Nos. 07-2466, 07-2467, 2008 WL 3114924, at *1-3 (7th Cir. Aug. 7, 2008).

---

[3] Scienter is not a requirement for a violation of either Section 17(a)(2) or (a)(3).  *See
Aaron*, 446 U.S. at 701-02.

The Court agrees with the Magistrate Judge that this is among the rare cases where such a conclusion is appropriate.

The evidence of defendants' recklessness was ably summarized by the Magistrate Judge.  The unrefuted evidence demonstrates that Brown received more than $1.62 million for the purpose of investing in Brawta, after Brown indicated to investors that this money would be used for investment purposes.  The analysis submitted by the SEC indicates that $496,550 of these funds were transferred to Jamerica; $262,906 were transferred to Brown or used to pay his personal debts; and $110,177 were withdrawn by checks payable to US Bank, with the SEC unable to determine exactly how they were expended.  This assessment is consistent with the analysis filed by the defense, which concluded that Brawta had made "unallocated" payments totaling $877,236.16.  In addition, the Magistrate Judge noted that Brown attempted to conceal many of these transfers by (1) converting funds to cash by writing checks directly to banks; (2) asking Gullickson to lie about the purpose of the $22,500 payment he received from Brawta; and (3) falsely characterizing contributions from Brawta to Jamerica as a capital contribution from Brown.  The evidence also indicates that the accounts where these funds were deposited were later used for personal expenditures listed above.  Moreover, Brown does not dispute that he overstated the value of Brawta's shares to its investors after those shares dropped significantly in value.  Finally, and significantly, the Magistrate Judge noted that the defendants brought forward no evidence demonstrating that the transfers in question were for legitimate investment purposes.

The defendants now argue that the Magistrate Judge ignored several possible legitimate purposes for the transfers described above.  They argue that (1) Brown transferred "a patent application or applications" to Brawta; (2) the defendants "would be entitled" to management fees for handling Brawta; (3) the defendant would have been entitled to "expenses and start-up costs costs" related to Brawta; (4) the defendant made investments in Artway Media and AmeriPost; and (5) in an exhibit filed with a declaration more than seventeen months ago, an accounting of Brawta's assets appears to include a $95,000 obligation to Jamerica.  (*See* Docket No. 108 Ex. 1.)  The Court agrees with the Magistrate Judge that these assertions fail to create a genuine issue of material fact.

As to the alleged patent application or applications, the defendants offer a mere one-sentence assertion, without offering any evidence or details concerning the nature of the patent or its value.  As to the management fees and business expenses, the defendants offer no specific explanation of what services were provided or what amounts the defendants would have been entitled to, and offer no supporting evidence that such payments actually occurred.  As to the Artway and AmeriPost investments, the defendants again fail to identify the nature or amount of these investments.  Moreover, both the SEC and the forensic accountant used by the defendants excluded investments in Artway and AmeriPost from their calculations.  (*See* Siiro Decl. ¶9; Javorski Decl.) Finally, the defendants have offered no explanation for when or if the alleged $95,000 debt to Jamerica was paid, and no evidence that it was involved in the specific transactions relied on by the SEC's accountant.  In sum, while the defendants have

suggested several hypothetical explanations for Brawta's unexplained expenditures, they have brought forward no evidence of any kind demonstrating that this was actually the purpose of the transfers in question.[4]  The defendants' mere speculation is not enough to create a genuine issue of material fact, particularly when placed alongside the substantial evidence of reckless securities law violations summarized above.[5]   Accordingly, this Court adopts the Magistrate Judge's recommendation, and grants the SEC's motion for summary judgment as to defendants' violations of the Securities Act and the Exchange Act.

## III.    VIOLATIONS OF THE ADVISERS ACT

The Magistrate Judge also concluded that the defendants violated sections 206(1) and (2) and Rules 204-2(a)(2) and (6) of the Advisers Act.   The defendants' only objection to this conclusion is that the Magistrate Judge relied on defendants' violations of the Securities Act and Exchange Act, which are addressed above.   The defendants argue that because the Magistrate Judge's recommendation as to those violations must be rejected, the Magistrate Judge's Advisers Act recommendation must be rejected as well. As set forth above, this Court has adopted the Magistrate Judge's recommendations as to the defendants' Securities Act and Exchange Act violations.   Accordingly, the

---

[4] The defendants also briefly mention an affidavit purporting to show that Jamerica never charged fees related to investments in Brawta.  (*See* Roby Aff., Docket No. 259.)  Even accepting this as true, however, there is no evidence in the record that any of the withdrawals discussed above went toward Brawta management fees.  Accordingly, this affidavit is not sufficient to create a genuine issue of material fact.

[5] The Court also notes that allowing the defendants to rely on such speculation now – after Brown refused to submit to a deposition – would appear to create the same fairness problem noted above, in this Court's exclusion of Brown's interrogatory responses.

defendants' objection is overruled, and the Court grants the SEC's motion for summary judgment as to the defendants' Advisers Act violations.

## IV.   FURTHER RELIEF

### A.   Permanent Injunction

The SEC also seeks a permanent injunction preventing the defendants from future violations of the securities laws addressed above.  To obtain such an injunction, the SEC must prove that (1) the defendants violated the law; and (2) "there [is] a *reasonable likelihood* of further violation in the future."  *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir. 1990).  "In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations . . . ."  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  "The existence of past violations may give rise to an inference that there will be future violations . . . ."  *Id.*  Finally, "permanent injunctions may be granted on summary judgment, given the proper record."  *Id.*

Here, the Magistrate Judge concluded that a permanent injunction was appropriate.  The Magistrate Judge based this conclusion on the long period of time over which the defendants' continuing violations occurred; Brown's attempts to convince Gullickson to conceal the diversion of Brawta funds; and the fact that Brown has been found in contempt of court for violating the preliminary injunction and asset freeze in this case.  The defendants now object to this conclusion, noting that Brown agreed to the preliminary injunction and asset freeze to the detriment of his family.

The Court agrees that a permanent injunction is appropriate.  While the defendants' agreement to the preliminary injunction and asset freeze was a positive step,

sporadic compliance with the securities laws does not preclude an injunction.  *See Murphy*, 626 F.2d at 655.  Moreover, this agreement carries much less weight when Brown was later held in contempt for violating this preliminary injunction.  That violation, in combination with the defendants' series of unlawful transfers, renders an injunction an appropriate remedy.  Accordingly, the Court overrules the defendants' objection and adopts the Magistrate Judge's recommendation that an injunction be entered.

### B.    Disgorgement with Prejudgment Interest

The SEC also requests that defendants be disgorged of the $869,633 misappropriated from Brawta.  The Magistrate Judge recommends granting this request, and defendants' only objections are based on arguments addressed above.  Accordingly, the defendants' objections are overruled, and the Magistrate Judge's recommendation that defendants be disgorged of $869,633 is adopted.[6]

### C.    Civil Penalties

The SEC also asks that the defendants be subjected to civil penalties pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act.  The SEC asks that it be given an opportunity to brief the issue of civil penalties if its motion for summary judgment is granted.  The Court agrees

---

[6] The defendants also argue that the SEC has been inconsistent in its assessment of the total damages.  However, they do not support this assertion with any citation to the record, or with any alternative view of what the total number should be.  In those circumstances, this assertion is not a basis for revising the figure recommended by the Magistrate Judge.

that further briefing on this question is appropriate, and has set forth a schedule for that briefing below.

## ORDER

Based on the foregoing records, files, and proceedings herein, the Court **OVERRULES** defendants Sherwin Brown and Jamerica Financial's objections [Docket No. 332] and **ADOPTS** the Magistrate Judge's Report and Recommendation dated June 12, 2008 [Docket No. 331] is. Accordingly, **IT IS HEREBY ORDERED** that

1.      SEC's motion for summary judgment against Sherwin P. Brown and Jamerica Financial Inc. [Docket No. 206] is **GRANTED**.

2.      SEC is ordered to file a brief within 14 days of this order addressing the appropriate civil penalty.  The defendants are permitted to file a response within 10 days of the filing of the SEC's brief.  The SEC is permitted to file a reply within 7 days of the filing of the defendants' response.  The Court will order oral argument on the issue only if the Court determines that such a hearing is necessary.


DATED:  September 30, 2008                  _____s/ John N. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                  United States District Judge